CIVIL CASE NO. **SA18CA0358 DAE**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

APR 2 0 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

JULIETTE FAIRLEY, Ind.
and as an Heir of James E. Fairley,
Plaintiff

VS.

MAURICETTE FAIRLEY, Ind.
and as Guardian of the person of
James E. Fairley, Defendant

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Plaintiff, Juliette Fairley ("Juliette"), as daughter and heir

of James Fairley ("James") and sues Mauricette Fairley ("Fairley"), guardian

of James Fairley, and says:

JURISDICTION AND VENUE

1. Defendant Mauricette Fairley, a naturalized citizen from France, is

domiciled in and deemed a citizen of the State of Texas

2. Plaintiff Juliette Fairley is domiciled in and a citizen of New York, a state

other than Texas for purposes of 28 U.S.C.1332

3. This is an action for money damages that exceed $75,000.00, exclusive of interest, attorney's fees and costs.

4. Accordingly, this is a civil action which falls within the Court's original jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship).

5. This court also has jurisdiction pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States. In addition, jurisdiction is conferred upon this Court, pursuant to the Rehabilitation Act of 1973 and the Americans with Disability Act (ADA) and the federal regulations of both issued there under.

6. Further this Court has jurisdiction to award attorney's fees and costs under the American with Disabilities Act and/or pursuant to 42 U.S.C. § 12205.

7. This Court has jurisdiction pursuant to the principle that deliberately fabricating evidence in a criminal proceeding "violates the due process clause of the 14th amendment when a liberty is at stake" and applies equally in a civil proceeding.[1]

PARTIES

---

[1] Costanich v. Dept. of Social and Health Services, 627 F.3d 1101, at 1108-1109 (December 3, 2010), which cites approvingly of the Washington State Supreme Court decision Jones v. State, 170 Wash.2d 338, 242 P.3d 825, 831-32 (2010)

8. Juliette Fairley is the biological daughter of Mauricette Fairley and James Fairley and statutory heir. She brings this suit for her individual losses and damages relating to her father.

9. Defendant Mauricette Fairley has engaged in notoriously bad conduct pursuant to TEC Section 1104.353, including fraud and criminal neglect of James' care.

10. Mauricette Fairley is sued for breaches of fiduciary duty. **(EXH A14)**

## GENERAL ALLEGATIONS

11. Born an American citizen in North Carolina, James Fairley's first marriage was to Joella Fairley.

12. After James and Joella Fairley divorced, James Fairley ("James") married Mauricette Fairley ("Fairley") and had a child together named Juliette Fairley ("Juliette"). Mauricette is 82 years old, born in France on March 5, 1936. **EXH A**

13. Mauricette Fairley's daughter Dorothy Merzouk ("Dorothy") born from a previous relationship was adopted by James Fairley. **EXH B**

14. At all material times during the marriage, James resided with Fairley in their Texas home at 1103 Old Lake until James was wheeled out

of the Fairley family home on a stretcher on or about April 18, 2010 by emergency ambulance workers with three broken ribs, malnutrition, dehydration and renal failure and admitted into ICU. **EXH C**

15. Juliette alleges that Defendant Mauricette Fairley (hereinafter "Fairley" or "Defendant") is failing to apply the proper protections which arise under the United States Constitution; the Americans with Disabilities Act, Titles II and III; and the rights of persons with disabilities.

16. Defendant Fairley is failing to protect her legally blind husband James from harm in the context of her position as an agent (other instrumentality) of the state's adult guardian system and in the process is violating James' constitutional rights, federal law protections and committing violations of state law. Juliette as James' adult child has associational standing. **EXH D1**

17. The constitutional violations qualify as conduct under color of law that shocks the conscience[2] as cited in an April 10, 2018 Southeast Texas Record article about the Supreme Court of Texas allowing violations of the mandates of the ADA and Section 504 of the Rehabilitation Act. **EXH D**

_____

[2] All exhibits referenced herein are attached and incorporated for all purposes as if fully set forth herein verbatim.

18. Fairley has caused her daughter Juliette loss and damages for which Juliette herein sues.

19. On or about April 18, 2010, James' physician Dr. Shaw contacted Juliette to inform her that the hospital would not be releasing James to his wife Fairley because she was not addressing his care needs. When Juliette reported the hospitalization of James to Adult Protective Services, Juliette was informed by case worker Jenny Stefanic that her concerns could not be addressed by APS unless she filed for guardianship. **EXH C**

20. From ICU, James was ultimately transferred to Horizon Bay Memory Care Facility, where Juliette visited him 2-3 times per month—from New York, where she lives. Juliette was very involved in his medical care along with her mother, Fairley, until Brookdale Senior Living acquired the property.

21. On one of Juliette's visits, she noticed that James had a partial denture and he responded that the dentist had pulled his teeth instead of filling cavities by Fairley's choice. Fairley chose to pull James' teeth rather than fill them citing cost even though James has private health insurance that covers the cost of filling cavities. **EXH K, EXH A**

22. Juliette and Defendant Fairley began at that point to disagree about what level of preventive medical care James was receiving because he has private health insurance that fully covers his dental and preventive medical care. Juliette and James' physician suspected neglect—which is not completely surprising given that Fairley is 82 years of age and on the decline in health. **EXH A**

23.   James continues to report multiple instances of questionable, objectionable care by Fairley, including walks outdoors in 100-degree heat in the summer and sessions in which James sits outside with Fairley in cool, breezy air without a coat or scarf in the cold

24.   Juliette spoke to Brookdale staff, James' Texas cardiologist Dr. Jarrett McGhee and the Veteran's Administration patient advocate office as well as several ombudsmans employed by the Alamo Area Council on Government.

25. A fellow military veteran named Randy Lee began visiting James. Mr. Lee reported that on July 18, 2011, he found James in pain lying on his bed in his room holding his stomach, which was blown up like a balloon. When Randy asked James what had happened, James said that the facility

staff had filled his stomach, with air in an examination room in another building. **EXH E**

26. Defendant Fairley grew angry when asked about this and said it was a stomach test that James' primary care doctor had ordered. Juliette called and asked if primary care physician Dr. Cavazos--had requested said stomach test to which Dr. Cavazos stated in writing that he was not aware of any stomach test medically ordered. Shortly thereafter Dr. Cavazos wrote a letter dated August 25, 2011 to Defendant Fairley stating that he:

> "...could not meet her expectations relating to her therapeutic instructions regarding her husband's care." **EXH F.**

27. On another occasion while James resided at Horizon Bay, Juliette received a phone call from Dr. Pham who was the facility physician. Dr. Pham reported that James had dangerously high blood pressure, but he could not locate Defendant Fairley so that James could be escorted to the hospital for treatment.

28. The facility had dropped off the legally blind and elderly James at the hospital with no paperwork and no escort. Juliette contacted the emergency room (ER) and informed the ER doctor on duty that James was there for high blood pressure. About an hour and a half later, Defendant

Fairley still was not at James' side in the ER. The doctor admitted James and planned to keep him overnight. However, when Defendant Fairley arrived a few hours later, she removed James against doctor's recommendation to keep him overnight for monitoring.

29. Horizon Bay executive director said that James would not be returned to the facility without a prescription. Juliette informed the executive director that there was already a prescription on file because James had been on blood pressure medication most of his life.

30. When Juliette visited her father early one morning at Horizon Bay, James was washing blood out of his underwear. Juliette asked him what had happened and he said that "this place is a dumping ground" at which point Juliette began to suspect James was being sexually abused. Juliette reported this to Fairley but she did not take action. A police report was filed. (12064751 by Officer Loffler #0748).

31. Adult Protective Services again investigated the neglect and suspicious care incidents and referred James to the Probate Court for Section 683 Court Initiated Guardianship. **EXH G(a)**

32. Defendant Fairley failed to pay the Guardian Ad Litem his fee of some $6,000, falsely stating in a letter that she could not afford to pay despite the couple's earnings of $65,000 a year. **EXH G(b)(c)(d), EXH B5**

33. The Department of Aging and Disability (DAD), investigated and the investigator Janice Schiffer said that James should be relocated out of Horizon Bay, which Fairley refused and failed to do, having the medical power of attorney at the time, such that Juliette could not do more to assist her father's safety.

34.   The executive director of Horizon Bay Memory Care began restricting visits from James' friends, including Missy Holt and Randy Lee. At the request of Defendant Fairley, the executive director required that James' visitors undergo and pay for a drug and urine test in order to visit James and to complete employment paperwork, which created discriminatory obstacles for James' visitors that other residents were not required to undergo. **EXH I**

35. Notice of intent to pursue a wrongful death lawsuit was sent by Plaintiff's Attorney Von Hoffman to Horizon Bay to forewarn them against neglecting James, abusing James or allowing James to suffer a fatal injury while residing at Horizon Bay. **EXH H**

36. James was subsequently evicted and relocated to Morningside Manor Assisted Living. A lawsuit was filed against Brookdale Senior Living in New York court for the elder abuse that was occurring at Horizon Bay but the suit was dismissed for lack of jurisdiction over the Defendants in Texas.

37. At Morningside Manor assisted living facilities, the executive director Paula Taylor was aware that there were issues with Fairley's care of James and lack of organization or pre-planning. Thus, she was supportive of Juliette's involvement. New management came on board lead by Shirley Little in about a year's time.

38. James informed his daughter that Fairley had pulled another one of his teeth—at which time Juliette filed guardianship over her father

39. Juliette noticed that James was probably not receiving treatment for glaucoma because his eye doctor issued a hand-written letter dated December 14, 2012 requesting that the facility staff ensure that James receive his eye drops to prevent blindness. An Ophthalmologist diagnosed James as legally blind. Juliette had to inquire with nurses to ensure her father received the drops. **EXH J.**

40. The guardianship proceeding on March 19, 2013 brought to light the fact that Defendant Fairley is choosing to extract James' teeth instead of

fill cavities. The Defendant was ordered to stop extracting James' teeth. The proceeding resulted in an agreement negotiated between Fairley and Juliette's counsel. This agreement included 5 points which were that a) Juliette would not speak to facility staff about my father's medical care b) Juliette would receive monthly medical progress reports from Fairley that would be addressed by Fairley through her attorney c) James and Juliette would have unlimited visitation by cell phone and in person d) Fairley would stop extracting James teeth and fill James' 13 cavities in two doctor visits and e) Fairley would provide James with a working cell phone. However, Defendant Fairley breached the agreement by refusing to pay James' cellphone cost. It was Juliette who paid for James' cellphone because the Defendant once again refused to spend James' retirement money on James' comfort and care. **(EXH K)**

41. Defendant Fairley breached the agreement again when she failed to provide Juliette with monthly progress reports on James' medical care. Defendant Fairley provided Juliette with just one progress report from James' medical records at the VA Audie Murphy Geriatric Clinic dated November 26, 2013 in which it was reported James' medication needed to be increased because his blood pressure was elevated. Medical records

subpoenaed from Morningside Manor in 2014 revealed that the nursing staff at Morningside Manor did not have James' blood pressure medication Lisinopril available to dispense to James for weeks at a time, including Jan. 21 to 22, June 29 and May 1 to May 10, 2014. **EXH L**

42. Fairley insisted on delivering James' medication to the facility. When confronted about delays, Fairley refused to have James' medications delivered from the VA directly to Morningside Manor so that the medications would arrive in a timely manner by mail.

43. Juliette accompanied James on his first visit to get cavities filled but the dentist only filled two cavities. A subsequent VA progress note documents that Sophie requested that James' visit to the dentist be shorter. As a result, James' cavities were not filled in the two requisite dentist appointments. **EXH M**

44. James developed a cough, which progressed to congestion. He also began losing weight. Juliette asked Fairley to address concerns with private gastro and pulmonary physicians, rather than at the VA clinic. Fairley agreed to make appointments but then sought to undo the private doctor visits by cancelling the appointments on December 20, 2013. Defendant Fairley stated she would only take James to a doctor if he looked

sick or complained of pain. Attempts to coordinate James' healthcare failed.
**EXH N**

45. Juliette noticed that when James ate a meal, he would cough uncontrollably until his eyes watered. It appeared he was choking on his food. Juliette informed Defendant Fairley of James' distended stomach and weight loss.

46. Fairley then approached Juliette about bringing aboard a care manager rather than return to court and Defendant Fairley requested that there be no attorneys involved. Juliette paid the Senior Bridge care management company out of her own pocket to assist with James' medical care because Defendant refused to spend James' pension money on James' care.

47. Defendant Fairley signed a release form authorizing the Senior Bridge nurse to speak with Juliette about James' medical care and they began a work up of James that included speaking to his physicians at both the VA and Morningside Manor assisted living as well as escorting James to his doctor's appointments.

48. Juliette received a detailed email from the Senior Bridge nurse with James' care plan to secure a referral for James to see a GI specialist and

to speak with his dentist about the progress of filling James' 13 cavities.
(EXH O)

49. Unfortunately, the Senior Bridge R.N. failed to follow through on their care plan to help with James' preventive medical care and stopped communicating because a week into the new arrangement, it was discovered[3] that Fairley deceptively lead Senior Bridge geriatric care manager to believe that a settlement agreement had been court ordered which prevented Senior Bridge from communicating with anyone other than Fairley. The settlement terms that Fairley presented as court ordered for Senior Bridge to enforce had never been officially attained or agreed to.

50. On or about May 1, 2014, James' stomach was grossly distended and when Juliette spoke to a Senior Bridge staff member, they encouraged her to call 911 if she was concerned. Juliette called 911 for an ambulance so that James could be treated at a hospital, which did not materialize because Fairley called and said there was no emergency. Fairley threatened a restraining order via email and Morningside Manor documents in James' medical record reveal that they informed Fairley that they would not restrict visitation. **EXH P, EXH Q,**

---

[3] Through James' medical record, which was subpoenaed

51. Because Defendant Fairley threatened to ban Juliette's visits with James, Juliette began to bring along friends to witness visits with James so that Defendant Fairley could not falsely accuse Juliette as the Defendant appeared desperate to separate the couple's adult child, the Plaintiff, from her husband James so that the Plaintiff could not document wrongdoing around James' care. **EXH P1**

52. The care management assistance from Senior Bridge was terminated by Senior Bridge on May 12, 2014 as a result of the legalities that were falsely put in place by Fairley in the form of a fake settlement agreement, which  prevented Senior Bridge from acting in James best medical interest.

53. Several letters were sent to Fairley's counsel about the neglect including on March 13, 2013, August 21, 2013 and September 13, 2013 but Fairley ignored these requests for medical attention. As a result, Juliette submitted a motion for an order to take James to a gastro and pulmonary specialist.  The hearing was initially set for August 4, 2014 but was postponed for 30 days because Defendant Fairley had surgery on July 28, 2014. **(EXH R, EXH R1)**

54. James' medical records, which were subpoenaed by Counsel, revealed the fake settlement agreement and that Fairley was not providing James' blood pressure medication for ten days at a time on several occasions, which could have caused James' a heart attack. **EXH L**

55. By cellphone on August 17, 2014, Defendant Fairley's daughter from a previous relationship Dorothy Merzouk hreatened to beat James, take pictures and blame Juliette, which was reported to Officer Jones (Badge #9537, Case# 14180941) by Juliette and Donna Jill Jones, a friend of James, who overheard the conversation. Donna Jill Jones frequently visited James at Morningside Manor to play cards. **(EXH S)**

56. Juliette then presented a motion that Defendant Fairley be ordered to take James to gastro and lung specialists and Fairley responded by presenting letters she had commissioned from James' supervising doctor at the VA Clinic, Mark Prange, which refused to refer him to gastro and lung specialist. Fairley also presented a letter from the Morningside Manor physician Dr. Zantua, which also stated James did not need gastro or respiratory specialty care. A Judge determined he had no jurisdiction to order Fairley to take James to the doctor and dismissed Juliette's application

to be James' guardian on September 14, 2014, stating that James did not need a guardian. **EXH T, EXH U**

57. This denial for medical treatment by Fairley, Dr. Prange and Dr. Zantua was reported to the Texas Medical Board (File #15-2068) and the SAPD (#15117139 Officer J. Hunter 9899). It is a Class B Misdemeanor to deny medical care to a person with disabilities, such as blindness,

58. James asked to leave with Juliette to New York City because he said, "People around here don't care about me." He had every right to do because James was not under guardianship and not deemed incapacitated.

59. Juliette agreed to take her father to New York for medical care he was being denied in Texas and informed Morningside Manor. **EXH V**

60. Within 24 hours of arriving in New York, Fairley was called on the telephone and informed by email of James' decision to relocate to New York with his daughter Juliette to receive medical care. The phone conversation is recorded and phone records are available.

61. Juliette called the New York Police Department and requested a welfare check on James. Officer Hartmann and Officer Pontebbi came to the apartment in Manhattan and were satisfied that James was safe. Juliette slept on the top bunk of a bed and James slept in the bottom bunk of the bed in

order to respect the decency boundaries of father and daughter and so that Juliette could assist James in the event of a medical emergency.

62. While James was under Juliette's care and guidance, a primary care physician, gastroenterologist, cardiologist, lung specialist and eye doctor treated him. The eye doctor (Natasha Nayak) said that James' glaucoma had progressed and asked Juliette to bring him back to the Eye Ear and Nose Clinic on East 14 Street in Manhattan. **EXH W**

63. Gastroenterologist Dr. Borcich stopped James' prescription of Omneprazole because he did not feel this was helpful for a person who had had a gastric resection and instead prescribed liquid Carafate to help James eat his meals more easily.

64. Cardiologist Dr. DuBois stopped Lasix and Lisinopril and started James on a higher quality blood pressure medication called Losartan that is covered by James' private health insurance. **EXH X**

65. Pulmonologist Dr. Diaz discovered that James had a sinus infection and replaced his prescription for Symbicort with Flutinase. James' health dramatically improved while under Juliette's care and he began to eat regularly and gain weight. His coughing and congestion disappeared. **EXH Y**

66. Fairley violated doctor's orders[4] and committed fraud on the Court when she brought James back to Texas by Habeas Corpus after criminally neglecting James' medical care. James was in New York with his daughter Juliette to obtain vital medical treatment he needed but was denied in Texas while under the Defendant's care. **EXH X, EXH W, EXH , EXH Y**

67. Defendant Fairley lied to the New York Judge, stating that James was in guardianship in Texas when this was untrue and her petition was only filed after James had safely relocated to New York with his daughter Juliette. Defendant Fairley lied in New York court filings claiming that Plaintiff Juliette was working with a gang of Jamaicans who had attempted to extort money from her in exchange for James' return. In actuality, James was receiving medical treatment in New York that Defendant denied James in Texas. **EXH Z, EXH U**

68. James was returned to Texas against his will on December 2, 2014 and placed by Defendant Fairley in a locked unit called Lakeside Memory Care where Defendant Fairley stated the other residents are not normal, indicating the environment is unsafe for James who is peaceful and friendly. Three months prior in October 2014, James had been residing at

---

[4] See New York Cardiologists letter stating that James was required to stay in New York for medical care.

Morningside Manor Assisted Living facility, which is not restrictive and where no residents are violent.

69. When a friend of James named Chris McHattan tried to visit, she was turned away at the request of Defendant Fairley. **EXH Z**

70. The same doctor (Mark Prange), who denied James preventive GI and respiratory specialty care at the VA, was supervising James medical care at Lakeside Memory Care. Dr. Prange was the medical director at Lakeside Memory Care until Juliette filed a complaint with the Texas Medical Board about the false documents Dr. Prange filed with the court. **EXH A1, EXH U(b)**

71. Dr. Prange deceptively stated in a court document that he had only been treating James since December 4, 2014, which is false because Dr. Prange's name is on several of James' doctor progress notes dating back to at least 2013 and because Dr. Prange had written a letter in August 2014 stating that James did not need specialty medical care, which Defendant Fairley presented to the Court after Juliette had filed a motion requesting an order for James to receive specialty medical care. **EXH A1, EXH U(b)**

72. Since that time, Defendant Fairley has maligned her daughter Juliette by falsely stating that Juliette abducted James and is a danger to

James when in fact at the time James travelled to New York for medical care in October 2014, James was not under guardianship. No abduction charges or restraining orders were ever filed against Juliette who ensured that James received medical treatment by a cardiologist, pulmonologist, opthamologist and gastroenterologist at Mount Sinai, the best medical center in New York, which James' private health insurance covers. **EXH T(b), EXH W, EXH X, EXH Y**

73. On February 11, 2015, Lakeside Memory Care, where James resides, expressed a desire to stop Juliette from ever seeing James again as long as he is a resident at Lakeside by calling the police, which was not their right or place. Cathy Howell, R.N., reported the incident in a statement that Lakeside Memory Care turned Plaintiff Juliette away despite a court order in hand and that if Plaintiff did not leave she would be arrested. Juliette and Ms. Howell sued Lakeside Memory Care as a result of this incident. The case was subsequently dismissed without prejudice. **EXH A2**

74. Despite her attempts to assist James, due to costs, Juliette was not appointed temporary guardian, but wrongfully ordered on December 11, 2014 to pay $20,000 in cash to cover James' Attorney Ad Litem and mental

health costs. Juliette was subsequently disqualified because she did not pay $20,000 in cash. **EXH A3**

75. Fairley's fraudulent representation that Juliette abducted James while he was under guardianship prompted the appointment of a visitation monitor whom Juliette has paid an hourly rate of $50/hour to visit James for a total of $21,000 over nearly four years, which has proven to be an effective barrier to prevent Juliette from visiting James.

76. The Guardian Ad Litem R.N. Nancy Ortiz, who is registered nurse (R.N.) recommended that Juliette's visitation be continued as in the best interest of James and even increased to several times a week however the Guardian Ad Litem failed to report Fairley's neglectful, paranoiac behavior and fraudulent statements to the Court. **EXH A4**

77. Juliette has not been able to resume visits with James since on or about April 19, 2017 because when Juliette reported that the monitor is unsafe on April 21, 2017, Fairley opposed removing the disruptive monitor and opposed unfettered, unrestricted visits. As a result, it has been a year since James has visited with his daughter Juliette due to Defendant Fairley's opposition and obstructions. Juliette has not spent a holiday, such as Christmas, Thanksgiving, Easter, birthdays with James in nearly four years

due to Defendant Fairley's fear that Juliette will uncover and report her wrong doing. **EXH A8**

78. Fairley has gone so far as to disinherit Juliette, stating in a Feb. 7, 2018 email:

> "I do not know how Renee or anyone else at the TRS (Teacher Retirement System) would have your phone, let alone link it it in any way to Mr. Fairley." **(EXH A11(c))**

79. Due to Defendant's pattern of failure to pay court costs, Juliette was ordered to pay James' Guardian Ad Litem fee of $5,000 as well as $4,000 to James' visiting R.N. Robbin Grulke, of Nurses Case Management, because Defendant Fairley has falsely reported that she has no money to pay these services that benefit her husband James. Defendant Fairley receives some $6,000 to $7,000 in James' pension money to pay these expenses. **EXH A5(a)(b), EXH B5**

80. While under Defendant Fairley's care, James has reported being served bad food that doesn't taste good, missing meals because he was left behind in his room and having to pay for a plate of food to eat, which indicates that Defendant Fairley is not fully paying the monthly bill to lodge James at Lakeside Memory Care with James' pension money or with the

$2,600 Defendant Fairley receives from the Department of Veteran Affairs to cover James' residency at Lakeside. **EXH A12, EXH A13**

81. On or about February 7, 2017, Dr. Devragiri, a physician at Christus Santa Rosa, informed Juliette that James' medical tests reveal that he is malnourished. **EXH A6**

82. On or about February 8, 2017, Defendant Fairley was negligent in being absent when Dr. Geraldine Klein sought authorization to administer anesthesia to James for surgery at Christus Santa Rosa. As a result, Dr. Klein contacted Juliette for permission. **EXH A7**

83. On May 16, 2017, after Plaintiff sued[5] Lakeside Memory Care for the 2nd time, Defendant Fairley contacted Juliette by phone to inform Juliette that she would relocate James to Autumn Leaves care facility so that Juliette could visit with James unfettered and without cost. **EXH A9**

84. After deceptively leading Juliette to believe that Defendant Fairley would allow Juliette to visit with James unfettered, without restriction and without cost, Defendant Fairley on May 19, 2017 requested that Juliette be banned from ever seeing James again despite James' daily requests to see their daughter Juliette. Defendant Fairley once again maligned Juliette

---

[5] Case No. 17-50826 Fairley v PM Management (Trisun)

falsely stating that Juliette is a danger to James when all Juliette has ever done is advocate for James to receive quality dental care, tasty, nutritious meals, quality medical care, residency in a higher end care facility and/or community care and that James be treated with dignity and in an honorable/respectful manner given his service in three wars (World War 2, Korea and Vietnam) **EXH A9, EXH A10**

85. In March 2018, Fairley cancelled James' private TRS health insurance, which James needs to cover visits to specialty physicians in private practice and to cover higher quality prescription medication such as Losartan for blood pressure. Juliette responded with a letter informing Defendant Fairley that in cancelling James' private TRS health insurance, she had lowered the quality of James' medical care and would cause a decline in James' health. **EXH A11(a)(b)**

86. Ample evidence of criminal medical neglect, medical battery, lack of skill/education, notoriously bad conduct and breach of fiduciary duties exists concerning Defendant Fairley's care of her husband James.

<u>COUNT I</u>
<u>Breach of Fiduciary Duty</u>

Plaintiff, Juliette, as the daughter and heir of James, hereby re-alleges and adopts by reference all allegations contained in paragraphs 1 through 86, *supra*, as if fully set forth herein.

87. The elements of Breach of Fiduciary Duty under Texas law are:

a.   The defendant has a fiduciary relationship. Defendant Fairley was appointed Guardian of the Person of James

b.   The defendant breached her fiduciary duty to the plaintiff Juliette. See paragraphs below incorporated here for all purposes.

c.   The defendant's breach(s) resulted in

  i.   injury to the plaintiff, or

  ii.   benefit to the defendant

88. As set forth below, Defendant Fairley's breach(es) of her fiduciary duties has caused the ongoing endangerment to and decline of James and loss and damages to Juliette.

89.  As James' guardian Defendant Fairley has a fiduciary duty to act in James' best interest, and among other things, a duty of loyalty.

90. Defendant Fairley's negligence and reckless behavior in the exercise of her fiduciary duties, has resulted in damages to James and to Juliette.

91. By failing to take actions for the benefit of James, Fairley caused the following breaches of fiduciary duty that include but are not limited to: (a) failing to pay James' Guardian Ad Litem Shawn Hughes $5,000, (b) failing to pay James' second Guardian Ad Litem Nancy Ortiz R.N. of Sage Care, (c) failing to pay James' visiting RN Robbin Grulke of Nurses Case Management, (d) failing to pay James' Attorney Ad Litem; (e) cancelling James' private health insurance, (f) failing to ensure that James' pension income is being used to pay for three nutritious, tasty meals a day (g) failing to ensure that James' pension income is being used to pay for dental care, (h) failing to take prompt action so that James is residing in a care facility that allows safe, unfettered visitation with James and that provides James with quality dental care and nutritious, tasty meals three times a day.

92. In breaching her fiduciary duties to James, Defendant Fairley caused loss and damages to her daughter Juliette. For example, when Fairley falsely mislead the court to believe Defendant could not afford to pay James' Guardian Ad Litem Shawn Hughes in 2011, **EXH G, EXH B5**

(a) the duty of paying $5,000 to James' second Guardian Ad Litem Nancy Ortiz R.N. in 2015 fell on Juliette; **EXH A5(a)**

(b) the duty of paying $4,000 to visiting R.N. Robbin Grulke of Nurses Case Management in 2016 fell on Juliette; **EXH A5(b)** and (c) the duty of paying $20,000 in cash to cover James' Attorney Ad Litem and mental health costs fell on Juliette in 2014. **EXH A3**

Count II
Negligence

Plaintiff, Juliette, as the daughter and heir of James, hereby re-alleges and adopts by reference all allegations contained in paragraphs 1 through 86, *supra*, as if fully set forth and herein the paragraphs below:

93. Fairley is unwilling to care for James' mental, emotional and physical health and retaliates against registered nurses who have the skill/education to act as James' care manager or guardian. Defendant Fairley called for sanctions against Cathy Howell R.N. when she applied to be James' guardian and/or care manager. **EXH A2**

94. Juliette has attempted, without success, to require Fairley to perform her statutorily-mandated duties as Guardian of the Person of James pursuant to Tex. Prob. Code 767(a)(2-3) and after January 1, 2014, pursuant to Tex. Est. Code §1151.051. Both Codes have essentially the same mandate, which is (a)(2) the duty to provide care, supervision, and protection of [James from abuse and neglect at the Lakeside care facility

from which Fairley refused to remove James despite their hostile and

retaliatory position towards James' family]; and (b)(3) the duty to provide

[James] with . . . food and medical care.

96. Defendant Fairley, as guardian of James, is negligently

administering the care and protection of James in the following ways:

(a) by failing to properly manage his health care and health insurance
(b) by depriving him time to visit with his daughter Juliette whom James raised
(c) by opposing visits by Juliette who is James' advocate and has been since Dr. Shaw contacted Juliette in 2010 about Fairley's inability to meet James' care needs.
(d) by failing to properly evaluate the quality of food, dental care and overall care James receives at Lakeside Memory Care
(e) by failing to take action to arrange for higher quality, less restrictive accommodations for the legally blind James that do not obstruct, restrict or add costs to visits with James and that provide James with three tasty and nutritious meals a day.

97. Defendant Fairley, as guardian of James, is negligently

administering the food and medical care of James while under guardianship

in the following ways:

a) By taking the action in March 2018 of cancelling James' private TRS health insurance because Defendant does not want to pay the premiums, which are minimal and which James' pension covers
b) By ignoring and turning a blind eye to Juliette when she brought to Fairley's attention the fact that cancelling James' private health insurance would lower the quality of James medical care and prescription medication and thus endanger James' life by causing a decline in James' medical condition.

c) By failing to ensure that James receives 3 tasty nutritious meals a day on a regular basis as opposed to meals that James does not like and that are hit or miss depending on the day. **EXH A12, A13**

d) By failing to take action to relocate James to a higher quality care facility that serve nutritious and tasty meals after Juliette informed Fairley that James was diagnosed as malnourished by Dr. Devragiri while residing at Lakeside. **EXH A6**

e) By failing to be present when James was scheduled for minor surgery on or about February 8, 2017. Fairley was negligent because she was nowhere to be found to authorize anesthesia. **A7**

98. At all material times, Fairley owes fiduciary duties to James but intentional negligence by action and inaction has resulted in the above described damages.

## Count III
## Disability Discrimination

Plaintiff, Juliette, as the daughter and heir of James, hereby re-alleges and adopts by reference all allegations contained in paragraphs 1 through 86, *supra*, as fully set forth and herein the paragraphs below:

99. James is a "qualified individual with a disability" as defined by the Americans With Disabilities Act 1990 (as amended) (the "Act") at 42 U.S.C. § 12131(2); 3 see also, 28 C.F.R. §§ 35.104 and 35.108(b)(1-2) and (c)(1)(I-ii) 42 U.S.C. § 12102(2). Langston v. Milton S. Hershey Med. Ctr., 2016 U.S. Dist. LEXIS 48332; 2016 WL 1404190 (M.D. Pa., April 11, 2016).

100. A "qualified individual with a disability" who is entitled to, and required to be given ADA protection is defined as:

> ". . . an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2)."
> United States v. Georgia, 546 U.S. 151, 153 - 154; 126 S.Ct. 877, 879, 163 L.Ed.2d 650 (2006).

101. "Associational standing" for Juliette Fairley under Title II of the ADA and as used by the ADA is addressed in C.F.R. § 35.130(g), as applied to Juliette Fairley under Title II. C.F.R. § 35.130(g)

> "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." Oak Ridge Care Ctr. v. Racine County, 896 F.Supp 867, 872 (E.D. Wi. 1995) and RHJ Med. Ctr., Inc. v. City of DuBois, 754 F.Supp.2d 723, 734-743 (W.D. Pa. 2010)"

102. As defined in Title 42 U.S. C. § 12131, the term "public entity" means any state or local government and any department, agency, special purpose district, or other instrumentality of a State or States or local government.[6]

---

[6] The County is a local government and thus is a "public entity" as defined in and under the Act, see 42 U.S.C. § 12131(1)(A).

103. Defendant Fairley is an other instrumentality of the County and is therefore a "public entity" as defined in and under the Act, see 42 U.S.C. § 12131(1)(B). As an "other instrumentality", Defendant Fairley, in her capacity as guardian, is responsible for providing the statutorily –required guardianship services to James.

104. This case argues for the Court to apply the reasoning of Estelle v. Gamble, 429 U.S. 97 (1976);  Youngberg v. Romeo, 457 U.S. 307 (1982); City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) and  M.D. v. Perry, 675 F.3d 832 (5th Cir. 2012) and the Memorandum Opinion and verdict of the Court in M.D. v. Abbott, 152 F. Supp.3d 684 (S.D. TX 2015) in recognition that disabled, guardianship wards of the State of Texas  are placed into involuntary court-ordered guardianships.

105. James is being institutionalized and segregated in a locked care facility rather than a less restrictive care facility for the purpose of isolating him from friends and families who care about James and want him to live as long as possible. Detaining James in a locked nursing facility is depriving James of (a) safe and unfettered visitation with his family and friends (b) oversight by his advocate daughter Juliette, the Plaintiff, (c) dental care, (d) safety and (e) three nutritious and tasty meals a day. **EXH Z, EXH A12**

Defendant Fairley has refused to take the appropriate action to relocate the legally blind James to a higher quality care facility that is less restrictive and that provides 3 nutritious, tasty meals a day without question.

106. Further, Fairley has excluded James from any meaningful access to the state's system of community-based services, housing and supports which James needs to be able to reside in the community.

107. The defendant Fairley, by all of her actions and inactions in violation of federal law has caused James to live a locked, prison-like institutional care facility that isolates James from his family and friends, even going so far as to refuse plaintiff Juliette access to her father James.

108. James has not been accommodated in any fashion that would permit him to leave the locked care facility to attend day habilitation programs, to visit with friends and family and consequently the lack of accommodation is depriving James of the right to attend social, recreational or religious activities outside of the nursing home.

109. Despite his ability to benefit from Texas's system of community-based supports that are available to other individuals with disabilities, James is experiencing unnecessary and prolonged isolation and

institutionalization in a locked facility in violation of the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12132 et seq.

Count IV
Integration Mandate Violations

Facts establishing violations of the Integration Mandate

110. During all times relevant to this case, specific facts which support

ADA claims of denial of, and violation of James' right to the "Integration

Mandate" 35.130(d) include, but are not limited to:

a.   The failure of Defendant Fairley as an other instrumentality of the County to evaluate James' needs, evidenced by the fact that no evaluation of James' needs related to the "integration mandate" has been made to date;

b.   The failure of Fairley to establish a procedure whereby the needs of James' in his capacity of guardianship ward can be properly evaluated, evidenced by the fact that there were no procedures in place or provided and Fairley failed to release information to Juliette

c.   The lack of ADA training of Fairley to act as guardian of James in relation to the integration mandate.

d.   The failure of Fairley as an other instrumentality of the County to seek placement alternatives for James and consider other alternatives for the care of James. Juliette proposed Blue Skies, formerly known as Air Force Village, Adante Senior Living and Franklin Park, all three of which said they would be happy to accommodate James and would not ban family visits.

e.   The failure of Fairley to take any action for the benefit of James regarding Juliette's complaints of inappropriate placement of James in a restrictive and dangerous environment at Lakeside Memory Care.

f.  Juliette's complaints resulted in Juliette being threatened with arrest, Fairley opposing expanded visits at hearings, Fairley filing motions to ban Juliette from ever seeing James and with James remaining in the dangerous, restrictive placement;

g.  The failure of Fairley to protect James who is legally blind after being moved to the more dangerous Lakeside Memory Care unit from the Morningside Manor Assisted Living;

h.  The failure of Fairley to seek adequate, tasty nutritious meals for James who complains of hunger, meals that are hit or miss and having to pay to eat. **EXH A12**

i.  The failure of Fairley to ensure the meals that Lakeside provides for James are tasty, nutritious and available to James after Fairley was informed that James was diagnosed as malnourished by Dr. Devagiri as evidenced by photos in which James has lost a dangerous amount of weight.

j.  The failure of Fairley to allow Juliette to sit with James during meal times and the failure of Defendant Fairley to allow Juliette to bring James a plate of food from local restaurants when James asked for restaurant food or to be taken out to eat.

k.  The failure of Fairley as an instrumentality of the County to consider the fact that the elderly, legally blind James expresses his desire to visit with his daughter Juliette daily.

l.  The acts and omissions by Fairley placed James in an environment providing less care, evidenced by the failures to take any action concerning malnourishment and dental care.

## Count V
## ADA Claims of Retaliation

As a person interested in the welfare of James, Juliette has certain

rights of citation and notice to guardianship events involving James to

which Juliette has been denied for which Juliette herein sues.

111. Plaintiff Juliette has advocated for James'

constitutionally-protected due process of law interests provided in and under

the Fourteenth Amendment, including, but not limited to the following:

a. the right to be heard on issues involving allegations of neglect,
maltreatment, and wrongful conduct by Fairley
b. the right to be transported to court hearings when
a hearing is taking place
c. the right to be free of retaliatory discrimination for exercise of
rights to due process, all guaranteed in, by, and under, the
14th Amendment as made applicable to the states by the
14th Amendment.

112. Plaintiff Juliette has advocated for James'

constitutionally-protected liberty interests provided in and under the First

Amendment including, but not limited to the following:

a. the right of free speech;
b. the right of free association with family and friends;
c. the right of privacy together with other persons of his choice;
d. the right of personal autonomy;
e. the right of free choice and self-determination; and
f. the right to be free of retaliatory discrimination for exercise of
freedom to speak out on matters relating to perceived discrimination
and mistreatment in violation of the ADA and related rights of
disabled persons, all guaranteed in, by, and under the First
Amendment as made applicable to the states by the 14th
Amendment, and guaranteed under the ADA and its companion Code
of Federal Regulations;
g. the right to medical care and services, nutritious food and

hydration;

h. the right to be placed in the least restrictive environment (the integration mandate);

i. the right to have guardian Fairley removed and replaced without retaliation.

j. the right to maintain life and be as pain free and comfortable as possible.

## Facts showing that Juliette suffered retaliatory acts in violation of Juliette's First Amendment Right to Freedom of Association.

113. Retaliation against Juliette for exercising her First Amendment right to free speech and Right of Association as evidenced by

a. Fairley filing motions to strike visitation or ban Juliette from visiting James on at least two occasions on separate dates. **EXH A10**

b. Fairley opposing expanding Juliette's visitation at an April 21, 2017 hearing **EXH A8**

c. Fairley discrediting Juliette by maligning Juliette with false statements not supported with police reports, police charges or restraining orders.

d. vicious and painful mal-treatment of James in retaliation for Juliette's advocacy to appeal the guardianization and exercise of her First Amendment right - to speak out on behalf of and in protection of James evidenced by the intentional starvation of James by Defendant Fairley in order to end James' life as quickly as possible, by taking James out into the cold without proper clothing and by taking James out to sit in 100-degree Texas heat for extended periods of time.

e. refusal to provide James with specialty medical care by private physicians, which James private health insurance TRS covers. James earned the TRS coverage working as a guidance counselor and teacher for the Northside Independent School District **EXH N**

f. Defendant extracting James' teeth instead of filing cavities when private dental insurance covers the filling of cavities **EXH K**

g. cancelling James' private health insurance, which covers private speciality physicians and higher quality prescription medication **EXH A11(a)**

h. Defendant Fairley disinheriting Juliette when James clearly declares Juliette in his will **EXH A11(c)**

114. Violation of Juliette's 14th Amendment due process rights to

meaningful hearings as evidenced by;

     a. failure by Fairley to provide accommodations in order for James to
participate in hearings

115. Violation of Juliette's 14th Amendment due process rights to
meaningful hearings as evidenced by

     a the failure by Fairley to accommodate James' presence and input in
court matters.

     b. by placing James at Lakeside, a locked memory care facility,
Juliette was unable to escort James to hearings as she had done at previous
hearings when James resided in a less restricted care facility (Morningside
Manor) that refused to bar visitation.

## Elements of ADA Retaliation Claims

116. As to Juliette:

     a. Juliette engaged in the filing of or making a
complaint to an entity charged with the responsibility of
oversight of disabled persons, a protected activity

     b. Juliette sought to remove Defendant Fairley as guardian

     c. Juliette was subjected to an adverse action by a public entity
or a private entity; and

     c. A causal nexus subsisted between the adverse action and the
protected activity.

## Facts that establish causal nexus

117. Once Juliette made her application to be James' guardian and the

threat of removal was made after Defendant was fraudulently appointed

guardian, Defendant Fairley began and continued the retaliatory acts set out above in Paragraph 113 and Paragraphs 1 through 86.

Juliette began advocating for James' relocation to a less restrictive care facility once finding Defendant Fairley refused to protect James, provide him with food and medical care  and in fact, moved him to the more restricted, dangerous environment of Lakeside in order to prevent Juliette from visiting James and to cover her wrongdoing.

<u>Prohibited Conduct</u>

118. ADA Retaliation (42 U.S.C. §§ 12203, 12134, 12131 and 12205a) protects all of the various ADA provisions. 28 C.F.R. § 35.134 is applicable to ADA Retaliation claims:

42 U.S.C. § 12203 provides:

§ 12203. Prohibition against retaliation and coercion

(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.
(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act. (Emphasis added.)

(c) Remedies and procedures. The remedies and procedures available under sections 107, 203, and 308 of this Act [42 USCS §§ 12117, 12133, 12188] shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to title I, title II and title III [42 USCS §§ 12111 et seq., 12131 et seq., 12181 et seq.], respectively. 28 C.F.R. § 35.134 provides:

(1) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.

(2) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part. (Emphasis ours) Statutory Authority: 5 U.S.C. 301; 42 U.S.C. 12134, 12131, and 12205a. 28 C.F.R. § 35.134.

119. This case involves 42 U.S.C. §§ 12131, 12134, 12203 and 12205a and 28 C.R.F. § 35.134.

Standing of Juliette Fairley under 42 U.S.C. § 12203 and 28 C.R.F. § 35.134

120. Juliette has standing to bring a retaliation claim because she advocated for and aided or encouraged James in the exercise or enjoyment of her rights under the ADA, referred to as "Associational Standing." See 42 U.S.C. § 12203 and 28 C.F.R. § 35.134, above.

Request for Injunctive relief for Juliette and James

121. Absent injunctive relief, James and Plaintiff Juliette Fairley will continue to experience unlawful retaliation as a result of the failures of Defendant Fairley to comply with Title III of the ADA.

122. Moreover, there are reasonable grounds to believe that Defendant Fairley will continue to engage in acts and practices prohibited by these statutes.

<u>Count VI</u>
<u>Fraud Against Defendant Mauricette Fairley</u>

Plaintiff, Juliette, as the daughter and heir of James, hereby re-alleges and adopts by reference all allegations contained in paragraphs 1 through 86, *supra*, as if fully set forth and herein the paragraphs below:

123. The elements of a cause of action for common-law fraud are set forth below along with Fairley's acts constituting commission of each element:

a. **The defendant made a representation to the plaintiff**

124. Fairley committed fraud by representation when she reported to Juliette and others that James did not need medical care for his chronic conditions.

125. Fairley committed fraud by representation when she promised that Juliette would be informed of James' medical conditions by Senior Bridge and by agreement on March 13, 2013.

126. On or about May 16, 2017, Fairley deceptively told Juliette she would relocate James to another care facility that would not oppose or obstruct visits between James and Juliette so that James and Juliette could freely visit.

### b. The representation was material.

127. Fairley made the representation that James did not need specialty medical care to Juliette. Fairley cancelled James' medical appointments with private physicians covered by James' private health insurance. Defendant Fairley subsequently cancelled James private TRS health insurance, which covers private physicians and higher quality prescription medication. This fact was confirmed by TRS, which contacted Juliette questioning Defendant Fairley's decision to cancel the policy, which James earned through working with the Northside Independent School District as a guidance counselor and teacher.

128. Defendant Fairley made this representation to Juliette by email and by signing a release form permitting Juliette to be informed.

129.  The representation that Fairley made to Juliette was that she would be physically permitted to visit James freely and in person after she relocated James to Autumn Leaves care facility.

**c. The representation was false.**

130. Letters from James' physicians in New York stated that James did require specialty medical care.

131. Fairley faxed a fake settlement agreement to Morningside Manor, stating that Juliette was not permitted to be informed of James' medical care, which demonstrates that Fairley intended that Juliette not be informed despite having signed a waiver and emailing Juliette of her consent to be informed.

132. Instead of taking action to relocate James to Autumn Leaves as Fairley has promised Juliette, Fairley filed a motion to strike visits with James forever.

**d. When the defendant made the representation, the defendant knew the representation was false . . .**

133. Fairley knew that James required medical care because Juliette had presented to Fairley a list of annual medical examinations that were prescribed to James by Medicare.

134. Fairley knew that by faxing a false settlement agreement to Morningside Manor that Juliette would be denied information about James' medical care.

135. Fairley did not inform Juliette until after she had promised to relocate James that the only way Juliette and James can visit unrestricted and unfettered is if Defendant Fairley banned Juliette's visits. This indicates that Defendant desired to falsely misrepresent to Juliette that by relocating James to Autumn Leaves, Defendant would then permit unrestricted and unfettered visits.

**e. The defendant made the representation with the intent that the plaintiff act on it.**

136. Fairley presented false letters to the Court because if she did not, Fairley was aware that Juliette would ensure James received specialty medical care. Fairley presented the letters to shield herself from any liability that James needed medical care.

137. Fairley was aware that Juliette would make a claim against Fairley for not following the informed consent waiver that would provide Juliette with information about James' medical care at Morningside Manor. As a result, Fairley faxed the fake settlement agreement to shield herself

from Juliette's claims of Fairley's failure to inform Juliette of James' medical care.

138. Fairley made the representation to Juliette that relocating James to Autumn Leaves, would give James and Juliette the opportunity to freely visit as much as desired.

## f. The plaintiff relied on the representation.

139. Initially, Defendant Fairley agreed to the medical appointments and Juliette relied on that representation and believed in Fairley's representation enough to make the specialty medical appointments James required. But then Fairley subsequently cancelled James' specialty appointments, creating anxiety for Juliette about the medical care that James was being denied.

140. Juliette relied on the waiver Defendant Fairley signed in order to receive information about James' medical care so that she could hold Fairley accountable for medical care James required. It was not until after Juliette subpoenaed James' medical records that she became aware of the fake settlement agreement, which Defendant Fairley had faxed to Morningside Manor to prevent Juliette from accessing James' medical information.

141. Both James and Plaintiff Juliette are dependent upon Fairley as the guardian to take action to relocate James to a care facility or community care facility that does not ban family members from visiting.

**g. The representation caused the plaintiff injury.**

142. When Fairley procured letters from Texas physicians stating James did not need care and when Fairley cancelled James' specialty appointments after agreeing to take James to specialty physicians, it caused distress and anxiety for Juliette because denying specialty medical care is denying James preventive medical care that can result in wrongful death.

**EXH N, EXH U**

143. Fairley's fake settlement agreement prevented Juliette from being informed of any medical care James was receiving so that Juliette could not advocate, which was a detriment to James. Fairley knew that Juliette intended to apply to be James' caregiver and guardian and sought to dismantle Juliette's proper position as a caring and duitiful daughter.

144. In failing to relocate James to Autumn Leaves as Defendant Fairley had represented, Plaintiff remains unable to visit her elderly father freely and unfettered, which has caused Juliette anxiety and distress because James' time on the planet is limited.

145. Plaintiff re-asserts that Fairley continues to commit Fraud when she misleads the court to believe that she does not have the financial resources to pay (a) James' guardian ad litem in 2011, (b) James' attorney ad litem in 2014, (c)James' Guardian ad litem in 2015 and (d)James' visiting R.N. in 2016. In actuality, James receives some $6,000 to $7,000 a month in pension income and jointly the couple enjoy an annual income of $65,000.

**EXH B5**

146. Plaintiff Juliette re-asserts that Fairley committed Fraud when she mislead the court to believe that Juliette had abducted James and is a danger to James, which resulted in Fairley's fraudulent application to be James' guardian.

147. Defendant Fairley's fraud set in motion the subsequent events of Fairley's breaches of fiduciary duty and her actions culminated in:

(a) the loss of the opportunity to be James' guardian, co-guardian or successor guardian
(b) the separation of James from his advocate daughter Juliette
(c) the loss of James' teeth due to a lack of dental care
(d) the malnourishment of James
(e) the isolation of James from his family and friends
(f) the denial of legal representation required by federal law because Fairley refused to pay attorney ad litem fees.
(g) the denial of medical care by private practice specialty physicians
(h) the denial of private health insurance
(i) the denial of higher quality prescription medication

148. Fairley's fraudulent acts set in motion an unbroken series of events which (a) put Fairley in control James' life; (b) allowed Fairley to deprive James and Juliette of the comfort each could give the other; (c) allowed Fairley to deprive James of specialty medical care by physicians, (d) allowed Fairley to isolate James from his advocate daughter Juliette and (e) allowed Fairley to breach her fiduciary duty and dump her duty on Plaintiff Juliette.

149. Defendant Fairley's exercise of control of James, put into place by Fairley's fraud, is resulting in (a) the decline of James condition, (b) the denial of nutritious, tasty meals to James, c) the denial of higher quality health insurance, prescription medication and medical care to James and (d) the deprivation of James' constitutional rights as well as federal rights under the ADA, the Rehabilitation Act and Civil Rights Act.

## PRAYER

Plaintiff Juliette Fairley demands a trial by jury on all issues so triable and requests the Court award damages against Defendant Mauricette Fairley and such other relief as the Court deems just and proper. Pursuant to 42

U.S.C. § 12205, Plaintiff seeks an award of discretionary Attorney fees and litigation expenses.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant Mauricette Fairley be cited to appear and to answer herein and that upon final hearing, the Court enter judgment in favor of Plaintiff against Defendant for compensatory damages; resulting damages; exemplary damages; pre-and post-judgement interest, such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled. Respectfully submitted on April 19, 2018

Juliette Fairley
P.O. Box 1497
New York, NY 10276
JulietteFairley@gmail.com
646-709-7828

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing complaint,and exhibits was served upon Defendant and/or Defendant's counsel.

Juliette Fairley
P.O. Box 1497
New York, NY 10276
JulietteFairley@gmail.com
646-709-7828